**WESTERN PUBLISHING COMPANY, INC., Plaintiff–Appellant,**

v.

**ROSE ART INDUSTRIES, INC., Lawrence Rosen and Jeffrey Rosen, Defendants–Appellees.**

No. 1423, Docket 90–7291.

United States Court of Appeals, Second Circuit.

Argued April 30, 1990.

Decided July 31, 1990.

Neil M. Zipkin, New York City (Ira E. Silfin, Amster, Rothstein and Ebenstein, New York City, of counsel), for appellant.

Robert L. Epstein, New York City (Harold James, James & Franklin, New York City, of counsel), for appellees.

Before FEINBERG, MESKILL and WINTER, Circuit Judges.

MESKILL, Circuit Judge:

This is an expedited appeal, pursuant to 28 U.S.C. § 1292(a)(1), from an order of the United States District Court for the Southern District of New York, Owen, *J.*, denying plaintiff-appellant Western Publishing Company's motion for a preliminary injunction under the Lanham Trademark Act (Lanham Act), 15 U.S.C. § 1051 *et seq.*, and lifting a previously issued *ex parte* order temporarily restraining defendant-appellee Rose Art's shipment of the "Magnetic GoldenSlate" from inventory. 733 F.Supp. 698.

We affirm.

## BACKGROUND

Plaintiff-appellant Western Publishing Company (Western) is a well established children's book and educational toy manufacturer widely known for, *inter alia*, its "Little Golden Book" products. Western owns more than one hundred federal trademark registrations for marks on what it calls the "Golden family," sales of which exceeded $850 million during the last five

fiscal years. Advertising expenditures approximated $75 million for the same period.

Defendant-appellee Rose Art Industries (Rose Art), a comparatively small, sixty-five year old firm also prominently engaged in the toy manufacturing business, recently developed and began selling a magnetic drawing toy under the name "Magnetic GoldenSlate." The GoldenSlate, which retails in the $10 to $15 price range, is a rectangular red plastic drawing slate with a gold colored screen capable of receiving and temporarily storing impressions written or drawn with a magnet-tipped stylus. Both the "Rose Art Brand" logo and the phrase "Magnetic GoldenSlate™" are prominently displayed on the package and on the slate. Rose Art conducted a trademark availability search prior to introducing the GoldenSlate but had not, at the time of suit, registered the mark.

On February 23, 1990, approximately one year after Rose Art first introduced the GoldenSlate at the annual toy industry show and after approximately 168,000 units had been sold, Western filed the instant suit alleging that the use of the GoldenSlate mark infringed Western's trademark rights under the Lanham Act. Western concedes, as it must, that it has no right to appropriate the term "Golden" for its exclusive use in the children's toy or game market. It nevertheless claims that Rose Art's use of the term in connection with the GoldenSlate could result in consumers mistakenly assuming that Western was the manufacturer of that product.

After obtaining an *ex parte* temporary restraining order (TRO) staying Rose Art's shipment of the GoldenSlate from inventory, Western promptly moved for a preliminary injunction against any further sales. The district court held an evidentiary hearing and found no likelihood of consumer confusion as to the source of the GoldenSlate. The court denied Western's motion for a preliminary injunction and lifted the previously issued TRO, which by that time had delayed Rose Art's shipment of inventory worth approximately $250,000. We subsequently denied Western's motion

for an injunction pending this appeal, but granted appellant's request to expedite the appeal.

## DISCUSSION

### A. *Preliminary Injunctions Under the Lanham Act*

■ In order to obtain a preliminary injunction in this Circuit, the movant must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir.1979) (applying *Jackson Dairy* standard to Lanham Act trademark infringement case). However, assuming that a particular mark warrants protection under the Lanham Act, the requisite likelihood of success on the merits and irreparable harm can both be established by showing a " 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or ... simply confused, as to the source of the goods in question.' " *Charles of the Ritz Group Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir.1987) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (per curiam), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979)); *accord Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988). Our initial inquiry, therefore, is whether the term "Golden," as used by Western, is eligible for trademark protection.

### B. *Eligibility for Protection*

■ Section 43(a) of the Lanham Act, which protects unregistered as well as registered marks, provides, in pertinent part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false

designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a).[1] The eligibility for and scope of protection under section 43(a), however, is dependent on the nature of the mark allegedly infringed—*i.e.,* arrayed in an ascending order that reflects both their eligibility for trademark status and the degree of protection accorded, the categories are (1) generic (ineligible for protection), (2) descriptive (eligible for protection with proof of secondary meaning), (3) suggestive (eligible for protection without proof of secondary meaning), and (4) arbitrary or fanciful (eligible for protection without proof of secondary meaning and "with ease of establishing infringement"). *See Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9–11 (2d Cir.1976) (Friendly, J.); *see also PaperCutter, Inc. v. Fay's Drug Co.,* 900 F.2d 558, 561–62 (2d Cir. 1990) (discussing *Abercrombie & Fitch* trademark categorization scheme); *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 212–13 (2d Cir.1985) (same). But, as we have repeatedly cautioned, categorizing a mark is a "slippery business" and necessarily turns on "the particular context of the mark's use, the context of its time of use, and the context of its group of users." *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81, 87 (2d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1755,

84 L.Ed.2d 818 (1985); *accord Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 489 (2d Cir.1988).

In the instant case, concerned with both the commonality of the term "Golden" and the numerosity of third party registrations in connection with it, the district court deemed Western's use of the term to be "descriptive"—*i.e.,* conveying " 'an immediate idea of the ingredients, qualities or characteristics of the goods.' " *Abercrombie & Fitch,* 537 F.2d at 11 (quoting *Stix Prods., Inc. v. United Merchants & Mfrs., Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968)). Thus categorized, protection is dependent on proof of secondary meaning, or, in other words, proof that the public has come to associate the term with a particular source. On appeal, Western argues that its use of the term is "arbitrary"—*i.e.,* so distinctive of a product's source that proof of secondary meaning is unnecessary—and, consequently, deserving of the highest degree of protection. *See id.* Although we have serious doubts as to whether Western's longstanding use of the term "Golden" in connection with both books and educational toys may properly be categorized as merely "descriptive" for purposes of *Abercrombie & Fitch* analysis, we need not resolve that question at this juncture. Even assuming that Western's use of the term warrants the highest degree of trademark protection, we conclude that, based on the present record, Western has failed to demonstrate the requisite likelihood of appreciable consumer confusion. It is to this critical requirement that we now turn.

### C. *Consumer Confusion*

The "likelihood of confusion" as to product source is evaluated by balancing the following factors articulated by Judge Friendly in *Polaroid Corp. v. Polarad*

---

**1.** As the district court correctly noted, "[Western] does *not* possess a registered trademark for the word 'Golden' in connection with every conceivable toy or game." (emphasis added). Rather, Western has simply registered "A Little Golden Book" for a series of children's books, and the word "Golden" in connection with specific puzzles, board or parlor games, and educational game sets. The district court therefore

properly limited its analysis to whether Western's *un*registered mark was entitled to protection under section 43(a)—the only provision of the Lanham Act that is not limited to registered marks. *See Banff, Ltd. v. Federated Dep't Stores, Inc.,* 841 F.2d 486, 489 (2d Cir.1988); *Thompson Medical Co. v. Pfizer Inc.,* 753 F.2d 208, 212 & n. 5 (2d Cir.1985). Our review is similarly limited.

*Elecs. Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961):

> [T]he strength of [plaintiff's] mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495. In reviewing the district court's application of the *Polaroid* factors, we note that " 'each specific finding is subject to a clearly erroneous standard, but the ultimate determination of the likelihood of confusion is a legal issue subject to *de novo* appellate review.' " *Hasbro, Inc.*, 858 F.2d at 75–76 (quoting *Banff, Ltd.*, 841 F.2d at 490). Because Western contests each of the district court's findings under the *Polaroid* analysis, we consider the factors seriatim.

### 1. Strength of the "Golden" Mark

■ It is well settled that the strength of a mark is "its tendency to identify the goods sold under the mark as emanating from a particular ... source," *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979), and while the *Abercrombie & Fitch* category in which the mark qualifies—generic, descriptive, suggestive or arbitrary—is useful in assessing strength, it is not dispositive. *Banff, Ltd.*, 841 F.2d at 491. "[T]he strength of a mark depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *McGregor–Doniger Inc.*, 599 F.2d at 1131; *see Pirone v. MacMillan, Inc.*, 894 F.2d 579, 582 (2d Cir. 1990).

As discussed previously, the district court categorized Western's use of the mark "Golden" as descriptive—"denot[ing] color of course, but also add[ing] to any noun an aura of high quality, freshness and warmth." Although Judge Owen acknowledged that " 'golden,' as used by [Western], ha[d] achieved certain secondary meaning, particularly in the area of children's books and educational toys," he concluded that "the numerosity of other [third party] products bearing the name 'Golden' weakens [Western's] mark."

Without deciding whether the district court's categorization was correct, we agree that, regardless of the *Abercrombie & Fitch* "pigeonhole" into which the "Golden" mark is placed, the origin-indicating quality of the mark is undercut by other parties' registration of over 2,000 trademarks incorporating the term "Golden"—113 of which are registered in the toy, game and paper products fields.[2] Moreover, even if we were to attribute greater strength to the mark than did the district court, we would reach the same ultimate conclusion, namely, no appreciable consumer confusion, because most of the remaining *Polaroid* factors outweigh any gain from enhanced strength of the mark. Finally, we do not accept appellant's contention that the district court failed to consider Western's trademark registrations for the mark "Golden" as applied to books, puzzles and board games. Judge Owen's finding with respect to secondary meaning is derived directly from Western's incontestable marks for those particular registered products.

### 2. Degree of Similarity

■ The test for determining similarity is whether the respective marks convey the " 'same general overall impression' " to the purchasing public when viewed separately. *Paco Rabanne Parfums, S.A. v. Norco Enters., Inc.*, 680 F.2d 891, 893 (2d Cir. 1982) (quoting *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979)); *accord Banff, Ltd.*, 841 F.2d at 492. "Ultimately, the crucial question is whether the similarity is likely to create confusion." *Hasbro, Inc.*, 858 F.2d at 77; *see McGre-*

**2.** With respect to Rose Art's alleged improper post-hearing submission to the district court of an unauthenticated schedule of third party registrations, the present record contains no indication that Western objected to either the form or the contents of this evidentiary submission. Western therefore has waived any objection to the district court's consideration of the schedule in question. *See* Fed.R.Evid. 103.

*gor–Doniger Inc.*, 599 F.2d at 1133 ("[I]n assessing ... similarity ..., it is the effect upon prospective purchasers that is important.").

The district court, apparently finding the degree of dissimilarity dispositive in the *Polaroid* balance, concluded that

> as used, [Western's] and [Rose Art's] marks are easily distinguishable. [Western's] various products other than books have either its own Golden [rising sun] logo and design on the package, or "Little Golden Book" or "Golden Book" with another word, such as "Golden Book Music Video." On none of [Western's] non-book products is the word "golden" used as a color description in conjunction with a simple noun, as in [Rose Art's] GoldenSlate.

A comparison of the marks in question, based primarily on photographs contained in the record, supports the district court's finding of dissimilarity. *See McGregor–Doniger Inc.*, 599 F.2d at 1133 ("degree of similarity" finding typically reviewed *de novo* because determination rests on a comparison of the marks themselves).

Perusal of a photocopy of Western's 1989 Book and Activity Products Catalogue shows that appellant uses its distinctive "golden rising sun" logo, either by itself or in conjunction with phrases such as "Golden Go Along Book 'n' Tape" ("wipe-off" activity books accompanied by audiocassettes) or "Golden Step Ahead" (preschool skill preparation pack). However, the word "Golden," as employed by Western, is seldom emphasized in any manner and, as the district court correctly recognized, is never used simply as a description of color. Rose Art, on the other hand, uses the term "Golden" only in the title phrase "Magnetic GoldenSlate"—a prominent, boldly lettered advertising label for one particular magnetic drawing slate that indisputably contains a gold colored screen. Not only is Rose Art's unique "slate" logo displayed in con-

junction with the product title on the package front, but the descriptive phrase "Gold Magnetic Drawing Board" is displayed in white lettering on the back side of the package.[3]

Consequently, based on a direct comparison of the marks in question, and in the absence of any evidence of actual consumer confusion, *see infra,* we conclude that Western's and Rose Art's labels, when viewed separately, do not create the same overall impression.

### 3. Product Proximity and Bridging the Gap

Although Western and Rose Art admittedly share a common, rather unsophisticated market for their goods, it is undisputed that Western does not currently market a product directly competitive with Rose Art's GoldenSlate. The third *Polaroid* factor—proximity of the products—therefore weighs heavily in favor of Rose Art. *Cf. Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir.1986) (significant record evidence of an overlap of market segments supported proximity finding).

On the other hand, the district court correctly concluded that Western *"could* hereafter bridge the gap" by creating a competitive product. (emphasis added). Western argues that it has already invested "several hundred thousand dollars and some number of years in seeking to develop a product which would be appropriate for precisely the place in the market where Rose Art's GOLDEN SLATE drawing toy is sold." While such a showing aids Western in establishing a future likelihood of confusion as to source, *see id.* at 874; *Scarves By Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1172 (2d Cir.1976), its conceded failure to bridge the gap since development began in 1984 lessens the weight accorded to this factor in the *Polaroid* balance.

---

**3.** In this regard, we note that Rose Art's concession at oral argument that it displayed a silver-screen prototype GoldenSlate at a 1990 Toy Fair undercuts its current litigation stance that the term "Golden," as used in connection with the GoldenSlate, is simply color descriptive. How-

ever, because the circumstances surrounding the 1990 display were neither comprehensively briefed nor vigorously argued to us, our conclusion regarding dissimilarity necessarily rests exclusively on the extant documentary record.

### 4. Actual Confusion and Good Faith

Despite Rose Art's sale of more than 168,000 Magnetic GoldenSlates since September 1989, the district court found "no evidence of actual confusion, or complaints, or mistaken orders, or other signs of uncertainty as to source of origin." This finding is not clearly erroneous, and is conceded by Western to be correct. Western argues, however, that the absence of actual confusion should not weigh heavily in favor of Rose Art because "[Western] acted quickly to protect its rights." We are not so persuaded. Unlike *Lois Sportswear*, 799 F.2d at 875, here, sales of the GoldenSlate were not only substantial but occurred during a time frame long enough for actual consumer confusion to surface.

The district court also concluded that "Rose Art, long known for its slates, adopted the mark GoldenSlate in good faith, and for good reason: it is a fair, accurate and even euphonious description of a slate that is in fact golden." This finding was, in part, based on Rose Art's consultation with its attorney who, prior to the adoption of the GoldenSlate mark, conducted a trademark availability search and advised Rose Art that the term was available for novelty slates or blackboards. Western argues that bad faith should have been "inferred" due to Rose Art's awareness of Western's registration of its "Golden family" of marks. We disagree. Based on the present record, there is no reason to overturn Judge Owen's finding of good faith.

### 5. Product Quality and Buyers' Sophistication

With respect to product quality, the district court concluded that Western's "criticisms of the quality of [the GoldenSlate] are irrelevant, as they relate to some accompanying papers, not to [the product] itself." We agree. Although a representative of Western testified that the GoldenSlate "does not meet [Western's] standards with respect to product integrity," the quality complaint actually focused on the "Bonus Activity" cards accompanying the GoldenSlate—cards that Western claimed were made of "relatively light weight paper ... and ... [we]re not really activity." We do not interpret this as a criticism of product quality serious enough to debase Western's reputation. *Cf. Lois Sportswear*, 799 F.2d at 875 (trademark holder's interest in protecting its reputation from debasement weakened by concession that allegedly infringing product was not of inferior quality).

Finally, although Judge Owen acknowledged that the rather unsophisticated nature of the buyers favored Western's claim of consumer confusion, *see Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1228 (2d Cir. 1987), the complete lack of evidence of actual confusion militates against according this factor much weight. *See Hasbro, Inc.*, 858 F.2d at 78–79.

In sum, accepting the specific findings of the district court as not clearly erroneous, but reviewing the ultimate determination of the likelihood of confusion *de novo*, we agree with the district court's conclusion that, for preliminary injunctive purposes, Western failed to demonstrate an appreciable likelihood of consumer confusion as to the source of the GoldenSlate. Even assuming the "Golden" mark as used by Western to be an arbitrary one, the numerosity of third party registrations incorporating the term "Golden" weakens its strength as an unregistered trademark. As the district court correctly noted, "[Western] may not appropriate to itself the exclusive use of the word 'golden' in connection with *every* children's book, toy or game." Moreover, although the rather unsophisticated nature of toy buyers and the possibility that Western might, some time in the future, bridge the gap weigh in favor of consumer confusion, based on the present record, the other *Polaroid* factors simply outweigh these concerns.

Because we base our decision solely on Western's failure to establish the requisite likelihood of consumer confusion at the preliminary injunction stage, it is unnecessary to address Rose Art's "fair use" defense under section 33(b)(4) of the Lanham Act, 15 U.S.C. § 1115(b)(4).

**64**

CONCLUSION

As a *de novo* balance of the *Polaroid* factors fails to indicate an appreciable likelihood of consumer confusion, the order of the district court denying Western's motion for preliminary injunctive relief is affirmed.