**PRISTINE INDUSTRIES, INC., Plaintiff,**

v.

**HALLMARK CARDS, INC., Defendant.**

**No. 90 Civ. 7600 (RWS).**

United States District Court, S.D. New York.

Dec. 18, 1990.

As Amended Dec. 26, 1990.

Shwal & Platt, New York City (Neal R. Platt, of counsel), for plaintiff.

Patterson, Belknap, Webb & Tyler, New York City (Thomas C. Morrison, Robert W. Lehrburger, of counsel), David C. Trowbridge, Dawn Roe Johnson, In–House Counsel, for defendant.

## OPINION

SWEET, District Judge.

*The Parties*

Plaintiff Pristine Industries ("Pristine"), a New York corporation, is a wholesaler of skiing apparel and other outdoor clothing bearing the "Hotdogger" label. Defendant Hallmark Cards, Inc. ("Hallmark"), a Missouri corporation, is a leading seller of greeting cards, as well as a seller of a wide range of other merchandise bearing the Hallmark label.

*Prior Proceedings*

On November 28, 1990, Pristine filed this action against Hallmark, alleging violation of §§ 32(1)(a) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1)(a) and 1125(a), common law claims of trademark infringement and unfair competition, and claims of false advertising and dilution based on N.Y.Gen. Bus.Law §§ 350, 350–a, and 368–d. On November 29, 1990, this court denied Pristine's application for a temporary restraining order against Hallmark's further sale of the disputed goods. Oral argument was heard on Pristine's motion for a preliminary injunction on December 6, 1990.

*The Facts*

Pristine or its predecessor has sold outdoor clothing sporting the "Hotdogger" name and/or a cartoon-type picture of an anthropomorphic hotdog (the "Hotdogger character") since August 1986. In February of 1989, Pristine bought the name "Hotdogger" (the "Word Mark") and the Hotdogger character from Hotdogger, Inc. In November of 1989, Pristine recorded its assignment of the federal trademark registration for the Word Mark (though not the Hotdogger character). The federal trademark is limited to clothing.

Pristine wholesales its Hotdogger line to approximately 1,000 retailers such as catalogues, department stores, and national specialty store chains such as "The Casual Corner." In all, a total of 3,500 retail outlets nationwide sell Pristine's Hotdogger sportswear, including ski shops at resorts such as Aspen, Vail, and Squaw Valley.

Pristine advertises its wares in Ski Business magazine. In addition, Pristine has entered into a cooperative advertising agreement with the department store Macy's, as well as a merchandizing agreement with American Express, in which certain American Express cardholders received order forms for Hotdogger sportswear in their monthly statements. Pristine's Hotdogger sportswear has been featured on a morning talk program, "The Regis and Cathy Lee Show" and has been the subject of an article in the New York Post.

Pristine has spent approximately $5,000 on advertising in the past year and had orders of approximately $5 million in 1989, of which it shipped $3 million. In 1990, Pristine had orders of $10 million, of which it shipped $7 million.

Of the several products sold by Pristine, two garments, a ski jacket and a "T"-shirt depict the Hotdogger character with a skiing motif. The ski jacket accounts for 15 percent of Pristine's sales. Pristine's most popular item accounting for 60 percent of sales is a warm-up suit that boasts two patches featuring the Hotdogger character. The warm-up suit jacket's interior patch depicts the Hotdogger character in a checked cap and sneakers; the patch on the outer arm shows the Hotdogger in a tropical setting, lounging in a deck chair with a cold drink in hand.

Hallmark sells greeting cards, decorations, and small gift items through a network of approximately 20,000 retail shops that are independently owned and operated under trademark license agreements with Hallmark. Hallmark itself owns and operates an additional 240 such gift shops. In addition, department stores such as J.C. Penny's and Dillard's carry Hallmark goods.

Most of Hallmark's merchandise is seasonal, with designs based, for example, on Valentine's Day, Halloween, and Christmas themes. It is one of these seasonal merchandise items that is at issue in this action.

In 1973, Hallmark introduced a line of Christmas tree ornaments under the name of "Hallmark Keepsake Ornament" (the "Keepsake Collection" or the "Collection"). The ornaments are individually packaged in festive boxes that display both the Hallmark and Keepsake Ornament names. The boxes are uniform for all ornaments in the line, with the exception that each box on its front contains a picture of the particular ornament it contains. The boxes comprising the year's Keepsake Collection are exhibited prominently in stores in special displays designed by Hallmark.

Hallmark designs the ornaments so that buyers will want to save their ornaments from year to year (hence the name "Keepsake"), as well as add to their collection each year. Thus, virtually all of the items in a particular year's line are new that year. At the end of the Christmas season, Hallmark destroys any unsold ornaments in order to preserve their "once in a lifetime" nature and to enhance their value as collectibles.

The Keepsake Collection has enjoyed success over the years, with sales growing from approximately $1.6 million in its first year to an estimated level of $93 million in 1990. The number of ornaments in each

year's collection has similarly increased from 18 in the first year to 197 in 1990.

Hallmark supplements its displays in stores with yearly catalogues of the Keepsake Collection that are sent to all shops featuring Hallmark items. In addition, Hallmark offers its perennial customers membership in the Keepsake Ornaments Collectors Club, which sends members a special catalogue called a "Dream Book." Hallmark also offers a "Keepsake Ornaments Collector's Guide", which describes each ornament in the collection since 1973.

During the Christmas shopping season, Hallmark advertises its Keepsake Ornaments on national television, as well as in magazines such as the Sunday New York Times Magazine and various national women's magazines.

Among the ornaments featured in Hallmark's Keepsake Collection this year is an figure of a hotdog on skis. Like the other ornaments in this year's Collection, the ornament at issue in this action is sold in the uniform Hallmark box featuring both the Hallmark and the Keepsake Ornament names. The box has a photo of the ornament on its outside cover, to which is affixed the label "Hot Dogger." In 1987, Hallmark offered a Santa on skis as part of its collection. That item was also labeled "Hot Dogger."

The development of each year's collection is a two-to-three year project in which an idea is transformed into a sketch, then a sculpture, and finally a manufactured product. In the case of the 1990 collection, Hallmark managers made the final decisions about the contents of the collection and the ornament designs in May of 1988 to ensure delivery to stores by July 1990.

Pristine's Hotdogger character is a cartoon depiction of an anthropomorphic hotdog in a bun. Attached to his hotdog torso are arms and legs. Pristine's Hotdogger is red in color, wears a black and white checked cap, sunglasses, white gloves and is portrayed with his mouth open, revealing a broad toothy grin. Pristine's Hotdogger is sometimes shown on skis, and on other occasions is shown in a tropical setting, lounging on a deck chair.

Hallmark's Hot Dogger ornament is a model of an anthropomorphic hotdog in a bun. Attached to his hotdog torso are arms and legs. The arms hold ski poles; the legs are wearing skis. Hallmark's Hot Dogger wears a green ski cap, sunglasses, white gloves, and sports a broad toothy grin.

### 1. *Standards for Preliminary Injunction*

To succeed on a motion for preliminary injunction in a trademark infringement action, the moving party must establish (a) irreparable harm, (b) either the likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair grounds for litigation, and (c) that the balance of the hardships tips decidedly in the movant's favor. *Wallace Int'l Silversmith v. Godinger Silver Art*, 916 F.2d 76, 78 (2d Cir.1990); *Home Box Office v. Showtime/Movie Channel, Inc.*, 832 F.2d 1311 (2d Cir.1987). Therefore, if it is unlikely that Pristine would succeed on the merits, the court must deny the motion for preliminary injunction.

### 2. *Likelihood of Confusion As a Common Element in Several Causes of Action*

A common element of Pristine's claim under § 32 of the Lanham Act, § 43(a) of the Lanham Act, its common-law trademark infringement claim, its common-law unfair competition claim, and its false advertising claim under N.Y.Gen.Bus.Law is a showing of a likelihood of confusion between Pristine's products and those of Hallmark. *Wallace*, 916 F.2d at 79; *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1003 (2d Cir.1983) ("As in all trademark and trade name cases, the crucial issue is whether there is any likelihood that an appreciable number of ordinary and prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question."); *Berlitz Schools of Languages, Inc. v. Everest House*, 619 F.2d 211 (2d Cir, 1980) ("The *sine qua non* of an action for trademark infringement, dilution of a trademark or

unfair competition is a showing by the plaintiff of the likelihood of confusion as to the origin of the goods at the consumer level."); *Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631 (2d Cir.1979) (§ 32 claim). As for Pristine's dilution claim under New York statute, such a claim may be established in the absence of likelihood of confusion as to source, as long as the plaintiff shows his mark is one of sufficient distinction to warrant the statute's protection and his mark has been tarnished or blurred sufficient to constitute dilution. *Warner Bros., Inc v. American Broadcasting Cos.*, 720 F.2d 231 (2d Cir.1983). Therefore, if Pristine can show that there is a likelihood of confusion between its goods bearing the Hotdogger name and Hotdogger character and Hallmark's Hot Dogger ornament, then the court will examine the other elements of the above listed claims.

### 3. Likelihood of Confusion: the Polaroid Standards

The Second Circuit has defined the standards for finding a likelihood of confusion in infringement cases in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). While the *Polaroid* case arose under the Lanham Act § 43(a), the factors enunciated in *Polaroid* are relevant to any cause of action in which likelihood of confusion is an element.

*Polaroid*'s multi-factor balancing test considers:

the strength of [plaintiff's mark], the degree of similarity between the two products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495.

As § 43(a) of the Lanham Act protects both registered and unregistered marks, the application of the *Polaroid* factors that follows will consider both Pristine's registered Wordmark and its unregistered Hotdogger Character.

### a) Strength of the Hotdogger Word Mark and Character

█ It is well settled that the strength of the mark lies in its tendency to "identify the goods sold as emanating ... from a particular source." *Western Pub. Co. v. Rose Art Industries, Inc.*, 910 F.2d 57, 61 (2d Cir.1990) (quoting *McGregor–Doniger Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979).

Pristine's Wordmark is a common slang term for a "show-off," particularly one who performs ostentatious stunts on skis or on a surfboard. *Webster's Ninth New Collegiate Dictionary* 583 (1985). The very word as defined in Webster's conjures up powerful visual images of skiers or surfboarders in antic performances, so that the design of a character based on a word that already contains strong connotations of surfing or skiing does not rise to the level of a strong mark.

Nor does Pristine's modest level of sales and its conservative advertising budget support the view that Pristine's marks are strong. Indeed, the Second Circuit has refused to recognize a mark as strong in cases where the plaintiff's product has higher level of sales than Pristine's $5 million. In the *Western Publishing* case cited above, the Second Circuit held that the children's book series under the name "Little Golden Books" was not a strong mark under the *Polaroid* test when the plaintiff's sales were $850 million and its advertising budget was $75 million over the preceding five years.

### b) Degree of Similarity Between the Two Marks

The similarity of Pristine's Wordmark to Hallmark's use of the label "Hot Dogger" is apparent. Weighing against this similarity is the fact that Hallmark sells its Hotdogger ornament under the Hallmark and Keepsake Ornament trademark. In several cases, the Second Circuit has held that the defendant's use of its own well-known mark would ensure that the goods at issue would be associated with the defendant and not the plaintiff. *Thompson Medical Co. v. Pfizer, Inc.*, 753 F.2d 208 (2d Cir.1985)

(defendant's "Ben Gay" name minimizes likelihood of confusion between plaintiff's "Sportscreme" and "Ben–Gay Sportsgel"); *Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960 (2d Cir.1981) (defendant's well-known name helped differentiate its "Bravos" tortilla chips from plaintiff's "Bravo's" crackers). Hallmark's name and the Keepsake Ornament name, generating as it does over $93 million of sales during its few months on the market this year, is similar in renown to those of the defendants in the above-cited cases. Therefore, the weight to be accorded to the similarity between Pristine's Wordmark and Hallmark's Hot Dogger label is minimal.

■ There are substantial similarities between Pristine's Hotdogger character and Hallmark's ornament. Both Pristine's and Hallmark's rendition of the Hotdogger character depict an anthropomorphic frankfurter in a bun wearing a cap and sporting a toothy grin. However, some differences exist. Pristine portrays its Hotdogger character in several different activities, of which only one relates to skiing. Hallmark, in keeping with the seasonal theme of its product sells only a skiing Hotdogger. Moreover, the strong connotations of the slang term "hotdogger", as noted above, suggest only a few ways of conceiving of the character. Therefore, the degree of similarity between Pristine's Hotdogger character and Hallmark's ornament is not dispositive under the *Polaroid* test.

#### c) *Proximity of the Products*

■ In assessing product proximity, the Second Circuit considers the nature of the products themselves and the structure of the relevant markets. *Vitarroz*, 644 F.2d at 967, citing *McGregor–Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1134–35 (2d Cir.1979). In several infringement cases in which defendant's and plaintiff's products could be considered by some to be substitute goods, the Second Circuit has held that the differences in the products were sufficient to deny protection. *See, e.g., Western Pub. Co.*, 910 F.2d at 62 (children's book series and children's drawing slate not proximate); *Plus Products v. Plus Dis-*

*count Foods, Inc.*, 722 F.2d 999, 1008 (2d Cir.1983) (health food store chain and supermarket chain not proximate); *Vitarroz*, 644 F.2d at 967 (tortilla chips and crackers, though both snack foods, not proximate). Christmas ornaments and ski wear are not by any stretch of the imagination substitute goods. Therefore, under the standards used in the above cited cases, which dealt with near substitute goods, Pristine's and Hallmark's products are clearly not proximate.

To buttress its claim that its product was not proximate to that of Pristine, moreover, Hallmark adduced evidence relating to marketing strategy. As Cynthia Graves, the business marketing manager for Keepsake Ornaments and social products, testified, Hallmark relies on creating a loyal following of repeat customers as part of its marketing strategy. These customers are concerned with adding to their existing collection of Hallmark ornaments, not with buying goods which appear to be the product of another company. Therefore, based on the nature of the goods and the differences in marketing strategies, the goods are not proximate under the *Polaroid* standard.

#### d) *Evidence of Confusion*

■ As evidence of confusion, Pristine asserts that it has been asked by at least one consumer familiar with Pristine's products whether Pristine is entering the ornament business. Whatever the weight to be accorded such anecdotal evidence, the Second Circuit has held that an overall dissimilarity between the products is enough to preclude a finding of evidence of confusion.

In *Plus Products*, for example, when the goods at issue—health food versus discount groceries—are more similar than the products disputed in this action, the Second Circuit concluded that "the dissimilarity between the goods as well as between the groups of consumers that each party targets substantially lessens the likelihood of consumers' misapprehending the source of either type of products. *Plus Products*, 722 F.2d at 1008. Hallmark, moreover, has adduced evidence in the form of Cynthia Graves' testimony, that its consumers are

women in their mid-to-late 40's. Pristine's products, appealing to those consumers with leisure time and a fondness for vigorous outdoor activity, appears geared to a more youthful market. Where, as here, the products are dissimilar (*see* proximity test, *supra*), and their consumers do not overlap, there is no likelihood of confusion.

### e) *Sophistication of Purchasers*

■ Both Pristine's and Hallmark's customers appear to be sophisticated consumers, at least in the sense that they look for a particular brand name and will accept no substitutes. Pristine's President Stanley Yagoda testified about an incident in which some stores received a shipment of Pristine sports wear from which the Hotdogger patch had been left off inadvertently. The stores insisted on sending the goods back. Similarly, Hallmark has introduced evidence such as its Keepsake "Dreambook" catalogue that shows that Hallmark customers are collectors looking for the Hallmark label. Therefore, the high sophistication of both groups of consumers weighs against a finding of any likelihood of confusion under the *Polaroid* standards.

### f) *Hallmark's Good Faith*

■ Hallmark has offered an affidavit of Ken Crow, the Hallmark artist who created the Hotdogger ornament, as evidence of Hallmark's good faith. Crow stated that he created the ornament without knowledge of Pristine's Hotdogger character or Wordmark. As Crow was not able to appear at the hearing to submit to cross-examination, the court is obliged to give less weight to his affidavit. Even ignoring Crow's affidavit, the testimony about Hallmark's production schedule shows that as Hallmark artists began submitting their ideas for the 1990 Keepsake collection as early as late 1987, the window of opportunity for copying was narrow. Moreover, even if such a window was deemed to exist, Hallmark's evidence about its consumers indicates that it would have no reason to want to pass its goods off as Pristine's.

### g) *Quality of the Goods*

As stated above, the goods are dissimilar and do not compete. Thus there is no real issue as to Hallmark's ability to produce inferior goods and tarnish Pristine's mark.

### h) *Balance of Equities*

■ Pristine's equity lies in the fact that it has owned a federal trademark registration for the Wordmark Hotdogger as applied to clothing. It also has a common-law trademark right in the Hotdogger character. In Hallmark's favor is the fact that it sold the Hot Dogger ornament under the Hallmark and Keepsake trademarks. In sum, it can hardly be said that the balance of equities swings overwhelmingly in Pristine's favor.

Weighing all the factors in the *Polaroid* test, it seems that there is no likelihood of confusion between Hallmark's and Pristine's products, given the fact that Pristine did not clearly prevail on any of the *Polaroid* factors. Therefore, Pristine has little likelihood of success on the merits in those causes of action in which likelihood of confusion is an element.

### 3. *Dilution*

■ A cause of action under N.Y.Gen. Bus.Law § 368–d requires two elements: 1) an extremely strong mark—either because of the mark's distinctive quality or because it has acquired secondary meaning—and 2) a likelihood of dilution. *See Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). Dilution is "an act which threatens two separable but related components of advertising value. Junior users may blur a mark's product identification or they may tarnish the affirmative associations a mark has come to convey." *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983) (citation omitted).

### a) *Likelihood of Dilution*

■ Like likelihood of confusion, likelihood of dilution requires a case-by-case factual inquiry. *Mead Data Cent., Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1035 (2d Cir.1989). Courts faced with anti-dilution actions in this Circuit have

stressed the following factors in considering the likelihood of dilution 1) similarity of the marks; 2) similarity of the products covered by the marks; 3) sophistication of consumers; 4) predatory intent; 5) renown of the senior mark; 6) renown of junior mark. *Mead Data*, 875 F.2d at 1035 (Sweet, J. concurring).

The discussion weighing the *Polaroid* factors has shown that while Hallmark's ornament is similar to Pristine's Word Marks and one of is characters, Pristine does not prevail on factors 2–6 listed above as factors to be considered in a dilution claim. Moreover, it has been shown that the similarity of the marks can be explained by the strong visual image denoted by the slang term "hotdogger." Therefore, balancing the above factors, Pristine has not shown a likelihood of dilution for the purposes of a § 368–d action. As a likelihood of dilution is an element of the cause of action, there is no need to reach the issue of the strength of Pristine's mark. Pristine has therefore not shown a likelihood of success on the merits of a § 368–d action.

### 4. *Pristine's Copyright Claim*

In a letter submitted after the hearing on the preliminary injunction, Pristine implies that it also has a cause of action for copyright infringement. Pristine does not state this cause of action in its complaint. Nor does Pristine allege anywhere that it has a valid federal copyright registration, an element of a cause of action under 17 U.S.C. § 411(a). *Warner Bros., Inc. v. American Broadcasting Cos.*, 654 F.2d 204, 207 (2d Cir.1981). Therefore, the court will not consider the copyright claim for the purposes of this motion.

### CONCLUSION

For the reasons set forth above, Pristine's motion for a preliminary injunction is denied.

It is so ordered.