**IDV NORTH AMERICA, INC. and R & A Bailey Co. Limited, Plaintiffs,**

v.

**S & M BRANDS, INC., Defendant.**

**Civil Action No. 3:97cv809.**

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 20, 1998.

Howard Feller, Brian C. Riopelle, Scott A. Simmons, McGuire, Woods, Battle & Booth, Richmond, VA, Albert Robin, Robin, Blecker, Daley & Driscol, New York City, Emily K. Breslin, The Paddington Corporation, Fort Lee, NJ, for Plaintiffs.

James C. Roberts, Alan D. Wingfield, Mays & Valentine, Richmond, VA, Everett W. Gee, III, Sarah A. Keefe, Womble, Carlyle, Sandridge & Rice, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

IDV North America, Inc. and R & A Bailey Co. Limited instituted this action against S & M Brands, Inc., alleging claims for statutory trademark infringement under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and for statutory unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The action was tried by the Court, sitting without a jury. Having reviewed the exhibits and the testimony of the witnesses, the Court makes the findings of fact and conclusions of law which are set forth below.

### A. The Plaintiffs, the Liqueur Products and the Plaintiffs' Trademarks

R & A Bailey, an Irish corporation with its principal place of business in Dublin, Ireland, produces all BAILEYS Irish Cream and BAILEYS LIGHT Irish Cream liqueur. The products are made in Ireland and sold worldwide. Since 1979, IDV, as the successor by merger to The Paddington Corporation, has been the exclusive importer and distributor of BAILEYS liqueurs in the United States. IDV, therefore, is responsible for all sales, marketing, advertising, merchandising, and promotion of the product in the United States.

On January 18, 1983, R & A Bailey was issued a registered United States trademark "BAILEYS" for liqueurs; and, on January 19, 1993, it received a registered United States trademark, "BAILEYS LIGHT," also for liqueurs. (Pls.' Trial Exs. 1,2.) On December 17, 1996, R & A Bailey was issued a United States trademark, "BAILEYS," for ice cream; and, on July 8, 1997, R & A Bailey obtained a registered United States trademark, "BAILEYS YUM," for alcoholic beverages, namely cordials and liqueurs. (Pls.' Trial Exs. 3,4.) Most recently, on January 13, 1998, R & A Bailey was issued a registered United States trademark, "BAILEYS," for coffee cups and ceramic accessories. (Pls.' Trial Ex 5.)

BAILEYS liqueurs are sold in the United States through a network of wholesalers and retailers. The channels of trade for BAILEYS liqueurs includes wholesalers, state liquor control stores, private retail liquor outlets, grocery stores, drug stores, duty-free outlets, airplanes, and a number of so-called "on-premises accounts," such as restaurants, bars, and hotels. Some of those channels of trade also sell cigarettes.

BAILEYS liqueur[1] is targeted to a market which IDV describes as "sophisticated socializers who enjoy 'real chat' with friends, good food and drink." (Def.'s Trial Ex. 8.) According to an IDV fact sheet, that market was thought to be comprised of college-educated, professional men and women, age 25–44, with an individual income in excess of $35,000. (Id.) The target market for BAILEYS LIGHT liqueurs is "100% female" and, according to IDV, that market consists of "health-conscious, sophisticated socializers who enjoy 'real chat' with friends and enjoy good, healthy, food and drink." (Id.) The IDV fact sheet indicates that the primary market for BAILEYS LIGHT is the college-educated, female professional or homemaker, age 35–54, with an individual income in excess of $35,000. (Id.)[2]

---

**1.** In this opinion, the basic BAILEYS liqueur product is referred to as "BAILEYS liqueur" or "BAILEYS Irish Cream" to differentiate it from the BAILEYS LIGHT Irish Cream product.

**2.** Edward Valley, IDV's Marketing Director for BAILEYS products, testified that, according to

sales statistics, the actual market is different than the target market, insofar as the demographics of age are concerned. Thus, in fact, 60% of all BAILEYS products were sold to people in the age group 21–39; 10 to 15% in the age group 40–50; and 25 to 30% in the age group over 50.

The BAILEYS liqueur products are deliberately promoted as premium brand items. To that end, the packaging, marketing and advertising for the liqueur products are depicted in a sophisticated manner, often with sensual overtones. (*See, e.g.,* Pls.' Trial Ex. 6.) The advertising, bottling, packaging, and promotions all are intended to connote wealth and sophistication. In pursuit of these sophisticated, well-heeled consumers, BAILEYS liqueur products are advertised in such magazines as *Victoria, Harpers Bazaar, Redbook, Smithsonian, Civilization, American Heritage, Black Enterprise, Food & Wine, Mens Journal, Travel & Leisure, Glamour, Self, Mademoiselle, People, Bon Appetit, Gourmet, GQ, George, Skiing, Martha Stewart Living, Cosmopolitan, Tennis, New York Magazine, Us,* and *Sojourner.* This deliberate appeal to affluence is reflected in the current price point for BAILEYS liqueurs: $19 to $20 per 750 ml bottle.

BAILEYS Irish Cream liqueur is sold in distinctive, expensive-appearing dark brown glass bottles embossed with an intricate seal which itself connotes stature and affluence. (Def.'s Trial Ex. 12.) The display panel label on the bottle is gold, deep green, white, orange, and dark brown, with the word "BAILEYS®" in all capital white letters with gold shadows on an arching dark background. (*Id.*) Below the main display panel appear the words "ORIGINAL IRISH CREAM®" in white capital letters on a metallic orange arching background. (*Id.*) Below the words "ORIGINAL IRISH CREAM" and above the words "BAILEYS THE ORIGINAL," there is a picture of the Irish countryside. (*Id.*) "BAILEYS THE ORIGINAL" is depicted in white, small capital letters against a brown background. (*Id.*) Below that appears the words "R & A BAILEY" in gold script and the words "R & A BAILEY CO., DUBLIN, PRODUCT OF IRELAND" in black capital letters across a deep green background at the bottom of the label. (*Id.*) The label on the neck of the bottle bears the word "IMPORTED" four times around the bottle and identifies "R & A BAILEY" three times. (*Id.*) Gold seals adorn the labeling. (*Id.*) The label on the back of the product is brown, gold, and orange, bears the word "BAILEYS®" in white and gold capital letters, and includes the following product description: "Baileys is a natural marriage of fresh Irish cream, Irish Whiskey and the finest of spirits—blended to perfection." (*Id.*)

The product labeling of BAILEYS LIGHT liqueur is essentially the same as for BAILEYS original Irish Cream liqueur, except that the label of that product indicates that it is a "LIGHT" product. (*Id.*) The inscription on the back label reads: "Like original Baileys, Baileys Light is created by blending the natural goodness of Irish cream with the finest of Irish spirits."

All of BAILEYS advertising bears the same stylized labels and motifs as those which appear on the bottles and the packaging materials. All BAILEYS products are clearly identified as imported from Ireland and are promoted as distinctive by virtue of their unique Irish origin, qualities and ingredients. (*See, e.g.,* Def.'s Trial Ex. 12.)

According to IDV, 60% of all BAILEYS liqueur products are consumed in personal residences. Most of the remaining 40% of the products are consumed in restaurants and bars. Although consumption of BAILEYS liqueurs often is in places where smoking of tobacco products also occurs, tobacco products are not now, and have never been, used to promote BAILEYS liqueurs. Nor is there currently any plan to associate tobacco product and BAILEYS liqueurs for purposes of advertising or promoting the liqueur products.

During the period 1987 through 1996, slightly in excess of $153 million was spent on advertising, merchandising, and promotion of BAILEYS liqueur products. (Pls.' Trial Ex. 11.) In addition to media advertising, IDV sponsors, in the BAILEYS name, ski events, figure skating events, and various food-related events. Today, BAILEYS liqueurs are the number one selling liqueur products in the world and they are the second leading liqueur products in the United States.

## B. The Defendant, the Tobacco Product and the Defendant's Trademark

According to the testimony of Mac Bailey and his son, Steven, the Bailey family has

been engaged in growing, buying, and selling tobacco in Virginia for five generations. Hence, the Bailey family's surname has been associated with the production and sale of tobacco for more than 100 years. Today, the Bailey family operates one of the largest tobacco farms in Virginia, serves as a tobacco dealer, and operates a large tobacco warehouse. On December 6, 1993, the family expanded its tobacco business by forming S & M Brands for the purposes of making and selling cigarettes, one ingredient of which is the tobacco grown on the Bailey family's farms. (*See* Def.'s Trial Ex. 6.) In July 1994, S & M Brands began selling cigarettes under the *"Bailey's"* name. On September 6, 1994, S & M Brands filed with the United States Trademark Office an application to register its *Bailey's* mark for cigarettes. The Trademark Office refused registration on its Principal Register but granted registration on the Supplemental Register for use with cigarettes.[3] (Def.'s Trial Ex. 7.) The Trademark Office did not cite the plaintiffs' BAILEYS mark for liquers against that being offered by S & M Brands.

*Bailey's* cigarettes are very inexpensive and hence are classified as a generic brand. S & M Brands sells *Bailey's* cigarettes primarily at convenience stores and grocery stores located in Virginia and North Carolina. Convenience stores and grocery stores in North Carolina and Virginia cannot, by law, sell liquor or liqueurs; and, therefore, *Bailey's* cigarettes are not sold in the same channels of commerce as BAILEYS liquor products in those states. *Bailey's* cigarettes are sold in Kentucky through cigarette outlet stores, which do not sell liquor products. In Georgia, *Bailey's* cigarettes are sold in convenience stores. According to Steven Bailey, *Bailey's* cigarettes are distributed in Virginia, North Carolina and Georgia

through large grocery store chains, such as Food Lion, Winn Dixie and smaller independent grocery stores. S & M Brands intends to expand its marketing to other states and, in several states, grocery stores and convenience stores are permitted to sell liquor and liqueurs.

S & M Brands advertises *Bailey's* cigarettes on billboards and at the point of sale. *Bailey's* cigarettes are not advertised in magazines. And, there is no evidence that *Bailey's* cigarettes and BAILEYS liqueur products are advertised in the same locations anywhere.

The target customer for S & M Brands *Bailey's* cigarettes, is age 20–54, is in a household the income of which is approximately $55,000 and is a sporting event spectator. The target customer makes purchasing decisions principally on the basis of price. (Def.'s Trial Ex. 11.) Data indicate that the actual customer for Bailey's cigarettes is in the same 20–54 age range, is generally not well-educated, and is in a household with an income of between $20,000 and $25,000.

The target market for *Bailey's* cigarettes is the brand loyal cigarette smoker who makes decisions to change brands almost exclusively on the basis of price. Hence, a key aspect of S & M Brands marketing strategy is to present *Bailey's* cigarette as a low price (9¢–$1.29 per pack), generic brand. S & M Brands' objective is to take market share from smokers of Marlboro cigarettes. (*Id.*)

According to Steven Bailey, since its inception in 1994, S & M Brands has sold a total of 11 million packages of cigarettes, 4.7 million of which were sold in 1997. S & M Brands expects its sales to be 12 million packages in 1998.

---

**3.** Registration of a mark on the federal Principal Register confers a number of procedural and substantive legal advantages over registration on the Supplemental Register, or reliance on common law rights. 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* §§ 19:9, 19:36 (4th ed.1996). Section 26 of the Lanham Act expressly excludes Supplemental Registrations from certain advantages gained by registration on the Principal Register. *Id.* § 19:36. For example, while a Principal Registration is prima facie evi-

dence of the registrant's exclusive right to use of the mark, Supplemental Registration does not have such evidentiary effect. Also, Principal Registration is constructive notice of claim of ownership so as to eliminate a defense of good faith, but a Supplemental Registration has no such effect. And, while Principal Registration may become incontestable after five years of registration, a Supplemental Registration can never achieve that status. *Id.*

S & M Brands presents its *Bailey's* mark in a stylized script font, in which the name is underlined. The statement "Premium American Tobacco" directly beneath the underlined *Bailey's* name. (Def.'s Trial Ex. 17.) The *Bailey's* mark is displayed in conjunction with a distinctive depiction of a tobacco barn and a circle which contains text describing the Bailey family's tobacco farming history and heritage. (*Id.*) *Bailey's* cigarette packaging is red, white, blue, green, and black. (*Id.*) The color of the bottom portion of the package is dictated by the cigarette type so that red is for regular cigarettes, blue is for "light" cigarettes, and green is for menthol cigarettes. (*Id.*) Advertising for the product tracks the same color scheme which is in accord with the packaging color scheme that is customary in the tobacco industry.

On the front panel of *Bailey's* cigarettes is the mark *Bailey's*, in black letters with the initial letter in uppercase and the remaining letters in lowercase. (*Id.*) The *Bailey's* mark is underlined in a stylized script font, and beneath the mark is the statement "Premium American Tobacco," all of which is printed against a gray and pinstripe background. (*Id.*) This mark is displayed above the tobacco barn encased in the circle. (*Id.*)

The top part of the back panel of the cigarette package is identical to the front. The center panel on the back is filled by a silhouette of the tobacco barn which appears on the front; but, on the back, the following words in white script appear: "Rich, smooth-tasting tobaccos from America's tobacco heartland. Quality that comes from the pride and heritage of Bailey's five generation family tobacco farms. A true American product."

Both the packaging and the advertising for *Bailey's* cigarette product focus on the product's Virginia family heritage as a distinguishing product feature. Like all cigarettes, those made by S & M Brands include various types of tobacco, many of which are not grown on the Bailey farms. For example, the cigarettes made and sold by S & M Brands include Turkish tobacco and Kentucky burley tobacco.

## C. The Likelihood of Confusion Survey

IDV engaged Dr. Dana–Nicolata Lascu, an associate professor of marketing at the University of Richmond, to conduct a study of the likelihood of confusion between "BAILEYS liquor" and *"Bailey's* cigarettes." (Pls.' Trial Ex. 16.) Dr. Lascu was accepted as an expert in marketing and marketing surveys. The survey which she undertook was conducted in nine towns in Virginia and one town in North Carolina, all of which were within a 100–mile radius of S & M Brands' manufacturing plant and were thought to be within the target area for *Bailey's* cigarettes. (*Id.*) The survey was of 464 people, 459 of whom gave valid responses.[4] (*Id.*) The survey was devised by Dr. Lascu, but it was conducted by students whom she had instructed in the survey method.

The survey method was, first, to display a package of *Bailey's* cigarettes to people as they exited the ten convenience stores involved in the survey and then to ask the questions reflected in the questionnaire devised by Dr. Lascu. (*Id.*) The survey technique known as "funneling" or the "focus technique" was used. According to Dr. Lascu, the "funneling" or "focus" technique is a generally accepted survey technique. To that end, Question Number 6 ("Who do you think makes *Bailey's* cigarettes?") inquired specifically about the particular product alleged to infringe the plaintiff's mark. Question Number 7 asked: "Do you think that the manufacturer of *Bailey's* cigarettes makes any other products?" Question Number 8 ("Are you familiar with any other products called *Bailey's* ?") focuses on the brand name *Bailey's*. Question Number 9 inquired: "What other products called *Bailey's* are you familiar with?" Question Number 10 asked: "Do you think that there is any connection between (BAILEYS Irish Cream/BAILEYS liqueur/BAILEYS alcohol, if mentioned by a respondent in response to Question Number 9) and *Bailey's* cigarettes?"

---

4. Four responses were eliminated because they were given by under age purchasers and one response was invalid because the person guessed the purpose of the study.

The data supplied by the survey participants was recorded by the surveying students who had no knowledge of the issues to which the survey was addressed or of its purpose. Dr. Lascu validated the survey by conducting telephone interviews with 46 survey respondents (or 10% of the survey population) to determine that they were in fact interviewed. The survey had a margin of error of 4.2% ±. (*Id.*)

Dr. Lascu testified that 102 of the 459 survey respondents gave the unprompted responses "BAILEYS Irish Cream," "BAILEYS liqueur" or "BAILEYS alcohol" as a product with the same brand name as the *Bailey's* cigarettes. Of those 102 people, 29 expressed the belief that there was an association between the BAILEYS liqueur or alcohol product which they mentioned in their responses and *Bailey's* cigarettes. Based on that assessment, Dr. Lascu concluded that 28.4% (29 out of 102) of the relevant survey population (individuals who were familiar with BAILEYS liqueur or alcohol products) believed that there was an association between the two products. On that basis, Dr. Lascu expressed the opinion that the survey had demonstrated an appreciable degree of likelihood of confusion with respect to the origin of the two brands.

S & M Brands responded to Dr. Lascu's survey by offering the testimony of Mr. Kenneth Hollander, a marketing research firm owner and an admitted expert in market research. According to Mr. Hollander, the survey performed under Dr. Lascu's direction was defective for several reasons. First, Mr. Hollander expressed the view that the survey population was inappropriate because the survey participants were in the market for only one of the two products at issue, namely, tobacco products. According to Mr. Hollander, the failure to include, in the survey population, persons who were in the market for both liqueur and tobacco products served to invalidate the entire report because it is inconsistent with accepted market research and survey practice.

Second, Mr. Hollander testified that the survey was defective because Question Numbers 7 and 10 invited a "yes" answer and, therefore, were leading. According to Mr.

Hollander, who relies on his opinion and industry practice as the basis for his views, leading questions render invalid surveys of the type conducted by Dr. Lascu.

Third, Mr. Hollander expressed the opinion that the survey report was unreliable because those who conducted it were not professional interviewers. According to Mr. Hollander, the use of non-professional staff in conducting a market research survey is inconsistent with industry practice.

It is on this record that the parties have argued the trademark infringement and unfair competition issues. The legal conclusions which follow are made on the basis of these facts as well as those which are included in the discussion of the legal issues.

## CONCLUSIONS OF LAW

■ To succeed in its request for an injunction for trademark infringement and unfair competition under the Lanham Act, the plaintiff must prove: (1) that its "BAILEYS" mark is protectable; and (2) that the defendant's use of the allegedly similar mark, "*Bailey's*" is likely to cause confusion among consumers. *See Lone Star Steakhouse & Saloon, Inc. v. Alpha·of Virginia, Inc.,* 43 F.3d 922, 933 (4th Cir.1995).

### I. Is The Plaintiff's Mark Protectable?

■ Where, as here, the registration of the plaintiff's mark, "BAILEYS," is incontestable, there is a strong presumption in favor of the mark's protectability and validity. *Lone Star Steakhouse & Saloon, Inc.,* 43 F.3d at 933. Trademarks generally are classified in one of four categories: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary. *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984). The parties are in agreement that the senior mark, BAILEYS, is a surname and, therefore, they agree that it is a descriptive mark. Descriptive marks "are accorded trademark protection only upon proof of secondary meaning." *Lone Star Steakhouse & Saloon,* 43 F.3d at 933; *see Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d at 455, 464 (4th Cir.1996). A secondary meaning exists "if 'in the minds of the public, the primary significance of a

product feature or term is to identify the source of the product rather than the product itself.'" *Sara Lee,* 81 F.3d at 464 (citation omitted). Here, the patent and trademark office permitted registration of the senior mark, "BAILEYS," upon a showing of secondary meaning.

IDV nonetheless acknowledges that the determination of the acquisition of secondary meaning is a question of fact. *See Little Tavern Shops, Inc. v. Davis,* 116 F.2d 903, 906 (4th Cir.1941). In assessing whether a mark has acquired secondary meaning, the Fourth Circuit has focused on four factors: (1) long use; (2) advertising; (3) sales volume; and (4) identity of service or origin in the minds of the purchasing public. *See Pizzeria Uno,* 747 F.2d at 1528 n. 3.

The senior mark, BAILEYS, has been used in the United States in association with liqueurs for almost 20 years (since 1979) and has been registered for 15 years (since 1983). During the period 1987–1996, sales of BAILEYS liqueurs in this country exceeded $1 billion, and during the same period, advertising expenditures exceeded $150 million. IDV has offered evidence of a 1996 market study which shows that the BAILEYS mark in liqueurs enjoys a 51% consumer awareness rating. (Pls.' Trial Ex. 14.) Taken together, this evidence demonstrates that the senior mark, BAILEYS, has acquired a secondary meaning with respect to liqueurs. And, the mark, as to liqueurs, is incontestable. Therefore, the plaintiffs' mark is a protectable mark, notwithstanding that it is a descriptive one.

In assessing the strength of a mark, the Court also may consider the extent to which third parties use similar marks, and a mark may be found weak where there is evidence of third-party registrations of the same mark and/or use of the surname in business listings. *See Petro Stopping Centers L.P. v. James River Petroleum, Inc.,* 130 F.3d 88, 93 (4th Cir.1997). The words "BAILEY," "BAILEYS," or "BAILEY'S" are listed as used in the names of approximately 4,000 businesses, and there are 52 active third-party federal trademark applications containing the term "BAILEY," "BAILEY'S," or "BAILEYS." (Def.'s Trial Exs. 14, 15). As S & M Brands correctly contends, these circumstances are indicia of a weak mark.

## II. Likelihood of Confusion

Likelihood of confusion is a question of fact. *Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 318 (4th Cir.1992). The principal issue is whether use of the accused mark is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1) (1997); *see Pizzeria Uno,* 747 F.2d at 1527. Of course, the trademark owner "need not demonstrate actual confusion," *Lone Star Steakhouse & Saloon,* 43 F.3d at 933, because, as the Fourth Circuit has explained, "'an unauthorized use of a trademark infringes the trademark holders rights if it is likely to confuse an ordinary "consumer" as to the source or sponsorship of the goods.'" *Id.* (quoting *Anheuser–Busch,* 962 F.2d at 318).

In *Pizzeria Uno,* 747 F.2d at 1527, the Fourth Circuit articulated a seven-factor test to be applied in making the determination whether there exists a likelihood of confusion under the trademark statute. Those factors are:

1. The strength or distinctiveness of the senior mark;

2. The similarity of the two marks;

3. The similarity of the goods/services the marks identify;

4. The similarity of the facilities used by the two parties and their businesses or in distributing the two products;

5. The similarity of advertising used by the two parties;

6. The defendant's intent;

7. Actual confusion.

In *Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 463–64 (4th Cir.1996), the Court of Appeals added two other factors pertinent to the inquiry. They are:

8. The quality of the defendant's product; and

9. The sophistication of the consuming public.

Not all of the factors are always relevant; nor are they of equal importance in each case. *See Pizzeria Uno,* 747 F.2d at 1527. Consequently, no one factor is dispositive on the determination of likelihood of confusion. *See Perini Corp. v. Perini Constr. Inc.,* 915 F.2d 121, 127 (4th Cir.1990).

■ Application of the controlling test to the facts shows that IDV has failed to establish by a preponderance of the evidence that the use of the trademark *Bailey's* by S & M Brands is likely to confuse the ordinary consumer as to the source or sponsorship of goods.

### 1. Strength and Distinctiveness of the Senior Mark

■ The strength or distinctiveness of the senior mark is perhaps the most litigated aspect of any trademark action. As explained in Section I, the plaintiff's mark has acquired a secondary meaning and is a strong, distinctive mark. However, that does not end the inquiry as to the strength and distinctiveness factor. A mark may be strong in the market in which it is used but weak in another market in which it is not used. 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 11:77 (4th ed.1996). Indeed, the strength of a mark may be confined to the products with which it is usually associated. *See Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 394 (2d

Cir.1995); 3 McCarthy, *supra* at § 24:49 ("Although a mark may be strong enough to result in confusion on competitive goods, it may not be strong enough to extend the scope of protection to non-competitive goods."). For those reasons, several decisions have made clear that a mark which is strong in its field is not as susceptible to confusion with an identical mark used in connection with a dissimilar, albeit somewhat related, field. 2 McCarthy, *supra* at § 11.77.[5] Thus, to the extent that secondary meaning plays a role in assessing likelihood of confusion, the evidence here demonstrates that the senior mark, while having a secondary meaning, and therefore strength, with respect to the liqueur products with which it is principally identified, the senior mark is not imbued with that status with respect to an unrelated product, such as tobacco. The evidence relating to the similarity of the goods and services which the respective marks identify is set forth in further detail below in the discussion of the third *Pizzeria Uno* factor.

### 2. Similarities of the Marks

It is correct, as IDV argues, that the letters which comprise the two marks here at issue are the same and that those letters appear in the same sequence in each mark. In that aspect, the only difference is that the

---

**5.** McCarthy cites a number of cases for this proposition including: *Colgate–Palmolive Co. v. Warner–Lambert Co.,* 1974 WL 20104, 184 U.S.P.Q. 380, 382 (Sept.3, 1974) ("Thus, while the term 'ULTRA' may be commonly used as a portion of marks for toiletries and cosmetics generally so that little, if any, trademark significance can attach thereto, yet in another limited sector of this same broad category of merchandise, this same term may be somewhat unique and possess a strong trademark significance to purchasers of such goods."); *La Maur, Inc. v. the Bagwells Enterprises, Inc.,* 1978 WL 21256, 199 U.S.P.Q. 601, 606 (Apr.27, 1978) (STYLE strong on cosmetics, weak for beauty salon services); *Mego Corp. v. Mattel, Inc.,* 203 U.S.P.Q. 377, 380 (S.D.N.Y.1978) (GALACTIC strong on non-space age products, but weak in the context of "a science fiction, out-of-space toy"); *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260 (5th Cir.1980) (DOMINO strong on sugar, weak on pizza or other food products); *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 394 (2d Cir. 1995) (mark strong on hand-operated stapler, but not on other products); *Aero Mayflower Transit*

*Co. v. Snark Products, Inc.,* 1976 WL 20920, 190 U.S.P.Q. 100, 105 (Jan.26, 1976) (MAYFLOWER strong in the moving and hauling trade, weak for sail boats); *Essence Communications, Inc. v. Singh Indus., Inc.,* 703 F.Supp. 261, 270 (S.D.N.Y.1988) (ESSENCE strong on magazines, weak on jewelry); *Best Flavors, Inc. v. Mystic River Brewing Co.,* 886 F.Supp. 908, 918 (D.Me. 1995) (MISTIC for spring water and fruit drinks strong, but not infringed by MYSTIC SEAPORT for alcoholic beverages).

*See also ConAgra, Inc. v. Geo. A. Hormel & Co.,* 784 F.Supp. 700, 714–15 (D.Neb.1992), *aff'd,* 990 F.2d 368 (8th Cir.1993) (concluding that even if HEALTHY CHOICE mark was strong for frozen foods, it was inappropriate to assume as a matter of fact that it was also strong in shelf-stable part of market); *Marshall Field & Co. v. Mrs. Field's Cookies,* 1992 WL 421449, 25 U.S.P.Q.2d 1321, 1333 (Sept.21, 1992) (finding that FIELD'S had achieved secondary meaning limited to department store services which did not extend to restaurant and bakery store services).

senior mark has no apostrophe between the letter "Y" and the letter "S" and the junior mark has an apostrophe between those letters. The actual letters employed aside, there are significant differences in the visual depiction of the respective marks. For example, the BAILEYS mark is depicted in all uppercase letters in a non-stylized font; in contrast, the *Bailey's* mark is depicted in a stylized script font with an upper case initial letter followed by lowercase letters. In any event, the similarity of marks alone is not dispositive because it is necessary to assess similarity and differences in the marks, not in a vacuum, but in the actual use of the marks in the commercial context. *See Petro Stopping Centers*, 130 F.3d at 94. The issue then is whether the marks, as actually used, are so similar in appearance and sound as to result in confusion. *See id.* (citing *Pizzeria Uno*, 747 F.2d at 1534). Moreover, differences in the goods and services with which the marks are used may indicate an absence of likelihood of confusion, notwithstanding an apparent overlap. *See Petro Stopping Centers*, 130 F.3d at 94–95.

When assessed, as used, and in perspective of the entirely different types of product with which they are used, the marks at issue here are not strongly similar, notwithstanding that they are comprised of the same letters in the same order. An examination of the advertising, the packaging and promotional materials illustrates the actual use of the marks and how they are not likely to be confused.

As set forth in detail above, BAILEYS liqueurs are marketed in distinctive, expensive-appearing dark brown glass bottles with an intricate seal of gold, deep green, white, orange, and dark brown, above a depiction of a scene from the Irish countryside. The word "BAILEYS" appears in all capital white letters with gold shadows on an arching dark background. The labels emphasize that the liqueurs are the "Product of Ireland," and the label on the neck of the bottles states that it is "Imported" four times. The mark is actually used to promote a product of Irish origin and is aimed at a sophisticated consuming public.

The defendant's trade dress presents itself in a significantly less sophisticated manner, using the word *"Bailey's"* with only the initial letter capitalized, in a black stylized script font, against a grey and pinstripe background, above the statement "Premium American Tobacco." The mark is displayed above a distinctive depiction of a tobacco barn, and a circle with text describing the *Bailey's* family tobacco farming history and heritage. Thus, the *Bailey's* mark is actually used to promote an American product to a very unsophisticated consuming public.

IDV is correct when it argues that likelihood of confusion as to source of sponsorship is not determined solely by a side-by-side comparison of the trade dress of the products. Nonetheless, courts cannot turn a blind eye to the reality that the trade dress, or the method of using and displaying the trademark, is a central factor in whether consumers will be confused. Indeed, IDV and R & A Bailey have spent hundreds of millions of dollars in advertising, merchandising, marketing, and promoting the registered senior mark in a truly unique and consistent fashion, so much so that the ice cream and mugs which are the subject of later non-liqueur registrations bear the identical trade dress. The millions of dollars spent on advertising and packaging of the unique BAILEYS liqueur leaves an indelible imprint on the minds of consumers of an Irish made product with Irish ingredients, which, of course, is precisely the reason for the expenditure of the millions of dollars in advertising, packaging and marketing the product. The constraints of reality point strongly to the conclusion that consumers associate the trade dress with the trademark, at least in this case. This undisputed fact militates strongly against any likelihood of confusion because the junior mark *Bailey's* for cigarettes and its trade dress does not remotely resemble the trade dress of the senior mark for BAILEYS liqueurs and related products.

S & M Brands strongly promotes its American tobacco heritage while the plaintiffs emphasize and promote the Irish origin of their product. In addition, the colors, fonts, capitalization, and style of the trade dress on the respective products are vastly distinct. Thus, if, as IDV urges, the issue is whether a person with only a recollection of

BAILEYS liqueur is likely to believe, upon seeing *Bailey's cigarettes,* that they are associated with the same source or sponsor as the liqueur, the actual use of the marks here totally dispels any such prospect.

### 3. Similarity of Goods and Services That the Marks Identify

The plaintiffs' mark, "BAILEYS," is registered with respect to liqueurs, ice cream, and ceramic coffee mugs. The defendant's mark, "*Bailey's,*" is registered only with respect to cigarettes.

■ Differences in the goods on which the marks appear are probative of the absence of likelihood of confusion. *See Petro Stopping Centers,* 130 F.3d at 94. However, a likelihood of confusion can be established even when the products on which the marks appear are not identical. Indeed, the Fourth Circuit has emphasized that the absence of direct competition between the goods identified by the alleged infringer's mark and the goods with the protected mark is not a bar to relief. *See AMP, Inc. v. Foy,* 540 F.2d 1181, 1183 (4th Cir.1976); *United States Hosiery Corp. v. The Gap, Inc.,* 707 F.Supp. 800, 813 (W.D.N.C.1989).

■ Nor does proof that the goods or services are non-competitive conclusively answer the question whether the goods are so "related" that a reasonable buyer is likely to believe that, because of the similarity of the marks, the alleged infringer's goods are somehow connected with, or sponsored by, the senior user. 3 McCarthy, *supra* at § 24:24. Goods are "related" if consumers are likely to believe, mistakenly, that the infringer's goods come from the same source as the senior user's goods or are sponsored

or approved by the senior user. *Id.* Thus, it is necessary to determine whether the non-competitive products in this case, liqueurs and tobacco, are "related" to the extent that confusion is likely as to source, connection, or sponsorship.

S & M Brands argues that the difference between the cigarette products bearing the alleged infringing mark and those which bear the protected mark is so distinct as to preclude a likelihood of confusion. In response, IDV relies on several decisions in which courts have found that alcohol and tobacco products are sufficiently related so that use of the same mark on both products is likely to cause confusion.

IDV correctly acknowledges, however, that there is no *per se* rule that use of the same mark on alcohol and tobacco products always will result in a likelihood of confusion. Nonetheless, IDV relies heavily on the decision in *John Walker & Sons, Ltd. v. Tampa Cigar Co.,* 124 F.Supp. 254, 256 (S.D.Fla.1954), *aff'd,* 222 F.2d 460 (5th Cir.1955), wherein the court enjoined the use of the mark "JOHNNIE WALKER" on cigars because of the fame of the plaintiff's mark for scotch whiskey and because the plaintiff advertised its scotch whiskey on, or in connection with, tobacco products. The court, in *John Walker & Sons,* placed great significance on the finding that the infringers use was a deliberate attempt to capitalize on the senior marks fame. *Id.* at 256. IDV also relies on *Carling Brewing Co. v. Philip Morris, Inc.,* 297 F.Supp. 1330, 1338 (N.D.Ga.1968), in which the court enjoined the defendant's use of the mark "BLACK LABEL" for cigarettes because it was likely to cause confusion with the plaintiff's well-known mark "BLACK LABEL" for beer.[6]

---

**6.** In like vein, the plaintiffs find comfort in *Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.,* 350 F.Supp. 1341, 1363 (E.D.Pa. 1972), *aff'd,* 480 F.2d 917 (3d Cir.1973). In *Dunhill,* the court held that the defendant's use of the mark "DUNHILL" on scotch whiskey presented a likelihood of confusion with the mark "DUNHILL" on defendant's smokers' products, such as cigars, pipes, tobacco, and gift items, including bar accessories. The court found that these products were related, not only because they commonly were used together, but because of "the suggestiveness, appeal or image created or attempted to be created by defendant's goods,

i.e, 'age,' 'stability,' 'British flavor,' vis-a-vis those of plaintiff." *Id.* The court further concluded that the defendant's adoption of the DUNHILL mark was intentional, an element which is not present in this case.

*See also Jno. H. Swisher & Son, Inc. v. the Madera Bonded Wine and Liquor Co.,* 1967 WL 7680, 153 U.S.P.Q. 861 (Apr.18, 1967) (KING EDWARD for scotch whiskey likely to cause confusion with KING EDWARD for cigars); *Geo. A. Dickel Co. v. Stephano Brothers,* 1967 WL 7301, 155 U.S.P.Q. 744 (Oct.12, 1967) (CASCADE for

Those decisions, however, must be considered in perspective of the principle that tobacco products and alcohol products should be considered related only in cases involving special circumstances. *Schenley Distillers, Inc. v. General Cigar Co.*, 57 C.C.P.A. 1213, 427 F.2d 783, 785 (1970). The presence of special circumstances has been found to exist where there is a finding of unfair competition or where a "famous" or "well-known" mark is involved *and* there is a demonstrated intent to capitalize on that mark. For example, in *John Walker & Sons*, the court was persuaded to find a relationship between products, and hence a likelihood of confusion, because of the plaintiff's long use and extensive advertising of its mark and placed great emphasis on the fact that the defendant used the trademark "Johnnie Walker with full knowledge of its fame and reputation and with the intention of taking advantage thereof." *John Walker & Sons*, 124 F.Supp. at 256; *see McKesson & Robbins, Inc. v. P. Lorillard Co.*, 1959 WL 5894, 120 U.S.P.Q. 306, 307 (1959) (holding that the decision in *John Walker & Sons* was "merely the law of the particular case based upon its own peculiar facts"); *see also Alfred Dunhill*, 350 F.Supp. at 1363 (defendant's adoption of "Dunhill" mark was not innocent). However, in *Schenley*, the court noted that the relation between tobacco and whiskey products is significant where a widely-known arbitrary mark has long been used for diversified products emanating from a single

source and a newcomer seeks to use the same mark on unrelated goods. *Schenley*, 427 F.2d at 785. Significantly, in *Schenley*, the court looked at the industry practice and the facts of the case in order to determine the nature and extent of the relationship between the mark on the tobacco product and the mark on the alcohol product. *Id.*

The record here establishes conclusively that IDV has never advertised BAILEYS liqueurs in conjunction with tobacco or tobacco accessory products and that IDV has no intent to do so. And, unlike the defendant in *Dunhill*, S & M Brands does not market bar accessories, or liqueur related products, with its cigarettes. The advertising and promotional materials presented at trial in this action demonstrate a complete lack of affiliation between the tobacco and liqueur products bearing the marks here at issue.[7]

Of equal significance, it is undisputed that S & M Brands had no intent, by adopting the family name *"Bailey's"* as the mark for its cigarettes, to capitalize upon the fame of the "BAILEYS" mark for liqueurs. *See Schenley*, 427 F.2d at 785. Moreover, as will be discussed below, and as found in *McKesson & Robbins*, the survey evidence refutes the contention that cigarettes and alcoholic beverages are so intimately associated in the public mind that they cannot under any circumstances be sold under the same mark without causing confusion. *See McKesson & Robbins*, 120 U.S.P.Q. at 308.

cigarettes likely to cause confusion with CASCADE for whiskey).

The decisions in the *Swisher* and *Dickel* cases are brief and do not elaborate on the rationale for the finding that there existed a likelihood of confusion. Both decisions rely on *John Walker & Sons, Ltd.*, which, as noted above, rested its conclusion as to the likelihood of confusion largely on the defendant's intent to capitalize on the famous nature of the plaintiff's mark. Although *Dickel* mentioned that CASCADE was a well-known mark, the court decided the case with the rather conclusory assertion that "we entertain considerable doubt on the basis of the present record that the mark 'CASCADE' can be used for both whisky and cigarettes without causing confusion or mistake or deception." 1967 WL 7301, 155 U.S.P.Q. at 745. Further, while *Dickel* and *Swisher* do not appear to involve infringing, or otherwise malevolent, intent by the defendant, the brevity of the opinion is inconclusive on that

matter, and indeed, both decisions' reliance on *John Walker & Sons* could indicate otherwise. Therefore, although they appear to support the plaintiffs' position, the two are of little persuasive value to the analysis which must be made on the facts presented here.

7. In contrast, the court in *John Walker & Sons* found that:

Whisky and cigars are closely related in distribution and use. Hotels, restaurants and bars supply cigars as well as whisky to their guests and customers. People frequently smoke cigars while drinking whisky. Pictures of Johnnie Walker smoking a cigar have been used in advertisements of Johnnie Walker whisky. Ash trays and books of matches with the Johnnie Walker name and picture on them have been used to advertise Johnnie Walker whisky. *John Walker & Sons*, 124 F.Supp. at 256. There has been no evidence of that ilk in this case.

Taken as a whole, the evidence here demonstrates the absence of the "special circumstances" in which courts have found a relationship between tobacco and alcohol products sufficient to tip the similarity of goods analysis in favor of the protected mark and against the allegedly infringing mark. It is true that BAILEYS liqueur, the world's best-selling liqueur and the second best-selling in the United States, is a well-known product. That fact alone, however, is insufficient to invoke the special circumstances connection here where so much other evidence and so many of the other factors disprove a likelihood of confusion. The similarity of products analysis, therefore, augers against a finding that there is a likelihood of confusion.

### 4. Similarity of the Facilities Employed by the Parties to Transact Their Business

Convergent marketing channels also may increase the likelihood of confusion. *See AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 353 (9th Cir.1979). On the other hand, if the goods of one party are sold to one class of buyers in a different marketing context than the goods of another seller, the likelihood that a single group of buyers will be confused by similar trademarks is less than if both parties sold their goods through the same channel of distribution. *See* 3 McCarthy, *supra* at § 24:51.

S & M Brands sells *Bailey's* cigarettes in convenience and grocery stores and in cigarette outlets. BAILEYS liqueur is sold in Virginia and North Carolina only in state-controlled alcoholic beverage stores which do not sell tobacco products. In Kentucky, cigarette outlet stores where *Bailey's* cigarettes are sold do not sell alcoholic beverages. While in certain parts of the country BAILEYS liqueur is sold in grocery stores, the liqueurs are not sold in convenience stores. Although it is clear that BAILEYS liqueur is sold in restaurants and bars which also sell cigarettes, *Bailey's* cigarettes are not sold in restaurants or bars.

The record here establishes that there is an insignificant overlap in the channels of commerce in the products which bear the marks at issue. And, it is clear from the evidence that the principal channels of commerce in which *Bailey's* cigarettes are sold are very different than the channels of commerce in which BAILEYS liqueurs are sold. Thus, this factor weighs strongly against the likelihood of confusion between the two marks.

### 5. Similarity of Advertising Used by the Parties

Under the *Pizzeria Uno* test, it is necessary also to consider whether the method by which the goods and products are advertised and promoted are similar. *Pizzeria Uno*, 747 F.2d at 1527. If so, the likelihood of confusion is increased. If not, the risk of confusion is diminished. *See Petro Stopping Centers*, 130 F.3d at 95.

The evidence in this action demonstrates a significant dissimilarity between the advertising, marketing and promotion modes respecting the products which bear the trademarks here at issue. BAILEYS liqueurs uses sophisticated advertising in upscale, rather expensive magazines, which no one contends are reviewed by the generally uneducated target customer for *Bailey's* cigarettes. Both products are advertised on billboards and both use some point-of-sale advertising. However, most of S & M Brands' advertising for *Bailey's* cigarettes is at the point of sale and on billboards, whereas most of IDV's advertising for BAILEYS liqueurs is in sophisticated magazines, and through the promotion of sporting events as to which there is virtually no demonstrated commonality of customer base for *Bailey's* cigarette products.

Further, the substance of the advertising used to promote the BAILEYS liqueur mark and the *Bailey's* cigarette mark is very different. Advertising for BAILEYS liqueurs is sophisticated, often with sensual overtones, whereas advertising for *Bailey's* cigarettes promotes a down-home and rural image, the antithesis of both sophistication and sensual association. The advertising for *Bailey's* cigarette product emphasizes the American aspect of its origins. The advertising for BAILEYS products emphasizes them as imported and of Irish origin. Ac-

cordingly, because the advertising of the marks here at issue is so fundamentally different, this factor strongly militates against a likelihood of confusion.

### 6. The Intent of S & M Brands

██ The intent of the defendant can be a determinative factor in deciding the likelihood of confusion in trademark infringement cases. See *Pizzeria Uno,* 747 F.2d at 1535. If there is proof of an intent to confuse the public, there is strong evidence establishing likelihood of confusion, "since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Id.; see also* 3 McCarthy, *supra,* at § 23:110 ("If there is proof of defendant's intent and purpose to trade on another's good will by using a similar mark to cause confusion, then the court will follow the alleged infringer's judgment and find a likelihood of confusion.") Of course, the absence of a malevolent intent is not a defense if there exists actual or likely confusion. See *Pizzeria Uno,* 747 F.2d at 1535.

The record is clear that S & M Brands had no intent to infringe when adopting the Bailey family name for its *Bailey's* cigarettes. Although the absence of intent will not preclude a finding of likelihood of confusion, the absence of intent is a factor which may be considered in assessing likelihood of confusion. Where, as here, a family is using its name in association with a product with which the family name has long been associated and where there is no element of infringing intent, this factor militates against a finding of likelihood of confusion.

### 7. Actual Confusion

There is no evidence of actual confusion in this case. That, of course, is not dispositive because evidence of actual confusion is not necessary to prove a likelihood of confusion. See *AMP,* 540 F.2d at 1186; *AMF,* 599 F.2d at 352; 3 McCarthy, *supra* at § 23:12.

██ Even where, as here, there is no evidence of actual confusion, a properly conducted survey of the relevant class of pro-

spective consumers of the goods or services at issue can be of use in deciding the likelihood of confusion. See 3 McCarthy, *supra* at § 23:17; *see* 5 *id.* at § 32:158. Survey results indicating a low percentage of "confused" participants is evidence of the absence of likelihood of confusion. See *e.g. Henri's Food Products Co. v. Kraft, Inc.,* 717 F.2d 352, 358–59 (7th Cir.1983) (7.6 percent evidence of no likelihood of confusion); *Wuv's Int'l, Inc. v. Love's Enterprises, Inc.,* 208 U.S.P.Q. 736, 756 (D.Colo.1980) (9 percent insufficient to prove likelihood of confusion); *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1361 (9th Cir.1985) (en banc) (less than 2 percent supports conclusion of no likelihood of confusion); *G. Heileman Brewing Co. v. Anheuser–Busch, Inc.,* 676 F.Supp. 1436, 1496 (E.D.Wis.1987), *aff'd,* 873 F.2d 985 (7th Cir.1989) (4.5 percent weighs against finding confusion). Conversely, evidence of a significant percentage of "confused" survey participants is proof tending to show a likelihood of confusion. See *e.g.* 5 McCarthy, *supra* at § 32:188; *Sears Roebuck & Co. v. Johnson,* 219 F.2d 590 (3rd Cir.1955) (74 percent persuasive evidence of likely confusion); *International Milling Co. v. Robin Hood Popcorn Co.,* 110 U.S.P.Q. 368 (Comm'r Pat. & Trademarks, 1956) (61.5 percent); *John Walker & Sons v. Bethea,* 305 F.Supp. at 1305 n. 2 (22–60 percent); *McDonald's Corp. v. McBagel's, Inc.,* 649 F.Supp. 1268 (S.D.N.Y.1986) (25 percent). Hence, an assessment of IDV's survey evidence is now in order.

██ First, the defendants assert that the survey results were not validated by a third party and therefore the survey is unreliable. That fact, however, does not affect the reliability of the survey because the method of validation did not violate industry practice and because the defendants have not substantively attacked the results of the validation actually performed by Dr. Lascu.

██ Second, the defendants argue that the survey is unreliable because the interviewers were not professionals in the survey field. That argument fails because industry practice does not prohibit the use of nonprofessional interviewers. In any event, Dr. Lascu trained the people who conducted the

survey and Mr. Hollander offered no criticism of the training methods employed by Dr. Lascu. And, of equal import, Mr. Hollander found no fault with the work done by those who performed the survey.

■ Third, the defendants contend that the survey is invalid because it was conducted with reference to an inappropriate universe of survey participants. This criticism presents a highly troublesome question. According to Mr. Hollander, the failure to include people who were in the market for both products completely invalidates the survey results. Having heard the views of Mr. Hollander and Dr. Lascu on this point, the Court concludes that the limited universe of survey participants does not render the survey completely invalid. However, the failure to include in the survey persons who are in the market for both products rather seriously undercuts the credibility of the survey because it excludes those most likely to be aware that BAILEYS liqueurs are not made by a tobacco manufacturer. By excluding persons in the market for both kinds of products (tobacco and liqueur cordials), the survey contained a built in bias. That alone leads the Court to conclude that the survey is of limited probative value in determining the likelihood of confusion issue. See 5 McCarthy, *supra*, at § 32:170.

■ Moreover, according to Mr. Hollander, the probative value of the survey is of virtually no utility on that issue because Question Numbers 7 and 10 are leading questions which invite answers that tend to suggest a likelihood of confusion where none may exist. Many courts have concluded that survey results are of limited efficacy where, as here, questions of a leading nature suggested a business relationship between the two products at issue. *See, e.g.* 5 McCarthy, *supra*, at § 32:175 ("[I]t will probably be improperly leading to suggest the desired response in the form of a yes or no question.").

Furthermore, questions which lead to, or suggest, an association provide "fuel for the next question as to who owns or sponsors" a particular mark, and therefore the presence of such questions in a survey render its results doubtful. *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 218 (D.Md.1988). Thus, a question which asks survey participants whether they believe that there is a connection between the plaintiff's and defendant's goods and services has been rejected as an improper leading question which lacks probative value and which prejudices the reliability of the survey. *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir.1984) (rejecting the question "To the best of your knowledge was Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?" because it presented survey respondents with a suggestive association, whereas in response to question "As far as you know, who makes Donkey Kong?", no one responded with plaintiff's name). Put another way, responses to questions which suggest an association are likewise of little probative value in measuring likely confusion. *See Riviana Foods Inc. v. Societe Des Produits Nestle S.A.* 33 U.S.P.Q.2d 1669 (S.D.Tex.1994) (concluding that the question "Do you think the weight loss product 'Sweet Success' and 'Success Rice' are more likely made by the same company or more likely made by different companies?" was leading and improperly suggestive); *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 450 (S.D.N.Y. 1982) (finding unreliable a 31% survey response to the question "Do you think there may or may not be a business relationship between Beneficial Capital Corporation and the Beneficial Finance System Companies?" because the question as framed had a leading quality, not well-suited to eliciting an uninfluenced reaction); *Marshall Field & Co. v. Mrs. Field's Cookies*, 25 U.S.P.Q.2d 1321, 1334 (Trademark Tr. & App. Bd. 1992) (finding initial inquiry of "Would you say that the store whose things came in this bag and the store whose things came in this bag have a business connection or a business association, with one another or not?" to be a leading question in that it indicated the direction the responses would be expected to go and deliberately planted in the respondent's mind the idea that there was a connection between the

stores).[8]

Question Number 7 is, as Mr. Hollander says, a leading question. Moreover, in *Beneficial Corp., Riviana Foods, Marshall Field*, and *Universal City Studios*, the responses to Question Number 10 "Do you think there is any connection between (BAILEYS Irish Cream/BAILEYS liqueur/BAILEYS alcohol, if mentioned) and *Bailey's* cigarettes?" are not probative of a likelihood of confusion because the question suggests an association between the two products. This is true even though the same respondent volunteered the name of the product in response to the preceding question because, like the survey found invalid in *Quality Inns*, Question Number 9, which allowed the respondent to associate and bring the BAILEYS mark to mind, only served to provide fuel for the next question suggesting a relationship between the two products at issue. *See Quality Inns*, 695 F.Supp. at 218. Because Question Number 7 and Questions Number 9 and 10 (when considered together) were leading and suggestive, the responses to them were prejudiced and may not be accorded weight in determining whether a likelihood of confusion exists.

The question which is far more probative of whether there exists a likelihood of confusion in this case is Question Number 8 which asked participants to identify what other products the makers of *Bailey's* cigarettes produced. Only 11 persons, or 2.4% of the survey universe, mentioned BAILEYS Irish Cream in their responses. That result, standing alone, is persuasive evidence that there is very little likelihood of confusion between the marks here at issue. Additionally, the other responses to the same question reflected that 119 persons (25.6%) of the survey population thought that the maker of *Bailey's* cigarettes made other cigarettes. This too points toward the absence of confusion.

Moreover, when asked the converse question, who made *Bailey's* cigarettes, only one person out of 459, or 0.2% of the survey population, identified BAILEYS Irish Cream. Seventy-six people, or 16.4% of the population surveyed, responded to that question by identifying Philip Morris, while fifty-six persons, or 12.1% of the survey universe, responded R.J. Reynolds. The responses to these two questions further tend to disprove the presence of confusion. Furthermore, those responses provide further evidence that the responses to Question Number 7 and Questions Number 9 and 10 (taken together) were adduced by the leading, suggestive nature of the questions, rather than by any confusion as to source or sponsorship.

Other courts have found that surveys demonstrated the absence of likelihood of confusion when possibly confused responses were as few as those reflected in the relevant question posed by plaintiffs' survey in this case. *See, e.g., Sara Lee*, 81 F.3d at 467 n. 15 ("We may infer from the case law that survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent."); *Henri's Food Products*, 717 F.2d at 358 (upholding district court's determination that 7.6% confusion finding weighed against likelihood of confusion); *ConAgra*, 784 F.Supp. at 727 (finding that resulting percentage of confusion of 7.3% was not large enough to support a finding that consumers generally are confused by offending mark); *Tyco Indus. Inc. v. Lego Systems, Inc.*, 5 U.S.P.Q.2d 1023, 1045 (D.N.J.1987), *aff'd*, 853 F.2d 921 (3d Cir.1988) (finding that 6% confusion rate was an insufficient level of alleged confusion); *Sunbeam Corp. v. Equity Indus. Corp.*, 635 F.Supp. 625, 635 (E.D.Va.1986), *aff'd* 811 F.2d 1505 (4th Cir.1987) (concluding that survey confusion rate of 1 .4% of respondents was insufficient evidence of consumer confu-

---

**8.** As explained by Professor McCarthy, it would not be leading to posit the possibility to survey respondents that there may be some form of affiliation or licensing behind a junior user's operation. 5 McCarthy, *supra* at § 32:175. For example, McCarthy states that it was non-leading for one survey to ask: "Though you may or may not have seen or heard of this restaurant, who do you believe sponsors or promotes MCBAGELS?"

*Id. See McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268 (S.D.N.Y.1986).

Professor McCarthy, however, drew a distinction between questions framed in that manner, and those which suggested the desired response in the form of a yes or no question, such as Question Number 10 in the plaintiffs' survey. 5 McCarthy, *supra* at § 32:175.

sion to preclude summary judgment); *see also* 5 McCarthy, *supra* at § 32:188 (observing that the lowest reported figure of consumer confusion is 8.5%, which the court found to be strong evidence of a likelihood of confusion where other evidence was also strongly supportive).

When the responses to the leading, suggestive questions are excluded and the responses to the relevant, properly phrased questions are considered, IDV can show only that 2.4% of the survey population exhibited confusion. Thus, even if the survey population is a proper one, the responses to the proper questions prove the absence, rather than the presence, of likely confusion of source or sponsorship between *Bailey's* cigarettes and BAILEYS liqueurs. *See* 5 *id.* at § 32:189 ("When the percentage results of a confusion survey dip below 10 percent, they can become evidence which will indicate that confusion is not likely.") Further, the low percentage of confused participants provides evidence for the defendant's argument that cigarettes and liqueurs are not so closely related that the strength of IDV's mark in the liqueur field should translate into strong protection for non-competitive, unrelated products such as tobacco and cigarettes. *See McKesson & Robbins*, 120 U.S.P.Q. at 308 (concluding that low survey percentages as to likelihood of confusion "refutes, rather than supports, opposer's contention that cigarettes and alcoholic liqueurs are so intimately associated in the public mind that they cannot under any circumstances be sold under the same mark without causing confusion."). For the foregoing reasons, the survey evidence in this action undercuts the plaintiffs' likelihood of confusion argument.

### 8. Quality of Defendant's Product

Consideration of the quality of the defendant's product is more appropriate in situations involving the production of cheap copies or so-called "knockoffs" of a plaintiff's trademark-protected, competitive goods. *See Sara Lee*, 81 F.3d at 467. "If a defendant markets a product under a mark similar to that affixed by a competitor to a commodity

of like nature but superior manufacture, that the defendant's product is markedly inferior is likely to be highly probative of its reliance on the similarity of the two marks to generate undeserved sales." *Id.*

In cases such as this one, involving non-competitive products, it is irrelevant whether the non-competitive user's goods or services are of higher, equal, or inferior quality. *See* 3 McCarthy, *supra* at § 24:15. IDV, nonetheless, argues that it is legitimately concerned that, given the perceived relatedness of alcohol and tobacco products, any consumer dissatisfaction with *Bailey's* cigarettes could have an adverse impact on the sales of its liqueurs. There is no evidence to suggest any such impact and, considering that the products are not in direct competition, that they are marketed to entirely different target markets, and that their actual markets are substantially different, this factor is a neutral factor in the assessment in this action.

### 9. Sophistication of the Consuming Public

As the Fourth Circuit has held, barring an unusual case, buyer sophistication will only be a crucial factor where the relevant market for the two products is not the public at-large. *See Sara Lee*, 81 F.3d at 467. If the average consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, their sophistication or expertise may be persuasive in calculating the likelihood of confusion. *See id.*

Although both parties have submitted argument on this factor, it, as a separate factor, is not really pertinent to the analysis of likelihood of confusion question in this action. There is no suggestion that the typical consumer of tobacco products or liqueurs is "sophisticated in the use of—or possesses an expertise regarding" either of the products at issue. *See Sara Lee*, 81 F.3d at 467. Thus, it is unnecessary to further consider whether this factor supports a finding of likelihood of confusion.[9]

9. IDV argues that BAILEYS liqueurs (which are priced at the 20.00 level and will be lowered to

the $17.00 or $18.00 level soon) are "relatively inexpensive" items which may be purchased on

## CONCLUSION

■ In the Fourth Circuit, the first and paramount factor in assessing the likelihood of confusion is the distinctiveness of the senior user's mark, followed by evidence of actual confusion. *See Sara Lee*, 81 F.3d at 467. As explained above, the senior user's mark is strong because of the acquisition of secondary meaning as to liqueurs, but its strength does not extend to the unrelated field occupied by the defendant's product. Further, there is no evidence of actual confusion, and the survey results proffered by the plaintiffs actually refutes the existence of any likelihood of confusion because of the low percentage of responses to the key questions which are addressed to that issue. Thus, the two most significant factors militate strongly against a finding that an average consumer could be confused as to the source, sponsorship, or affiliation of the defendant's product with the senior user's.

Nor do the other *Pizzeria Uno* factors warrant a finding of likelihood of confusion. Although the letters (and their sequence) comprising the plaintiffs' and defendant's marks are almost identical, an examination of how the marks actually are used in the commercial setting rather clearly points to the absence of confusion. Further, although courts have recognized a relationship between tobacco and alcohol products, the facts of this action do not support a finding of "special circumstances" which would be the necessary predicate for a finding that there exists a relationship between BAILEYS liqueur products and *Bailey's* cigarettes of the

sort that would lead to a likelihood of confusion by the average consumer.

Although there is some overlap in the facilities employed by the plaintiffs and defendant to sell their goods, the principal channels of commerce in which *Bailey's* cigarettes are sold are distinct from those in which BAILEYS liqueur products are marketed, further supporting a finding of absence of confusion. And, there is also some overlap in the manner in which the parties market their products, but the dissimilarities are materially stronger than their common features, especially considering the fact that BAILEYS concentrates its advertising efforts on upscale magazines, and in promotion of sporting events, in which *Bailey's* cigarettes do not advertise, and the fact that the substance of the two types of advertisements are very distinct.

Finally, it is undisputed that the defendant did not adopt *Bailey's* for its cigarettes with any intent to take advantage of any consumer goodwill accrued by IDV for its BAILEYS liqueurs and related products. In fact, the evidence, which shows that the Bailey family has been using their family name for many years in association with tobacco grown on the family farm, supports the opposite conclusion.

For the reasons set forth above, the Court finds that, on the record taken as a whole, the plaintiff has not met its burden of showing that the defendant's use of the *Bailey's* mark for its cigarettes is likely to cause confusion among customers. On this record the plaintiffs, therefore, do not succeed on their claims of statutory trademark infringement and statutory unfair competition.[10]

---

impulse. It is not clear why IDV considers this evidence of unthinking impulse buying presents the need for analysis under the expert consumer sophistication factor. The argument fails because its premise is wrong. Notwithstanding the effect of inflation, $17.00 or $20.00 is not relatively inexpensive in an absolute sense; and it certainly is not inexpensive relative to a package of *Bailey's* cigarettes which sell for 99 cents to $1.29 per package. But, even if the premise were correct, the argument would fail because the consumers of *Bailey's* cigarettes are generally not well-educated, while the consumers of BAILEYS liqueurs are generally well-educated. The product advertising convincingly demonstrates that BAILEYS liqueurs are pitched to a consuming public not likely to be confused respecting

the source or sponsorship of *Bailey's* cigarettes and BAILEYS liqueurs.

10. The plaintiffs' claim of unfair statutory competition under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) is premised on the allegation that the defendant's use of their mark, *Bailey's*, constitutes a false designation, description, and representation that the defendant's products originate, are sponsored or approved by the plaintiffs (*i.e.* that it is likely to cause confusion for those reasons). Because the Court finds that consumers are not likely to confuse the defendant's *Bailey's* tobacco products with the plaintiffs' BAILEYS liqueur products, the plaintiffs' unfair competition claim likewise fails based on

Hence, the plaintiffs are not entitled to injunctive relief enjoining S & M Bailey from using *Bailey's* as a trademark for its cigarettes and the action will be DISMISSED WITH PREJUDICE.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

the same rationale which is dispositive of the statutory trademark infringement claim.